**PURE MILK AND ICE CREAM
COMPANY, Appellant,**

v.

**S. P. TOMLINSON, Appellee.**

No. 12310.

Court of Civil Appeals of Texas,
Austin.

Oct. 22, 1975.

Rehearing Denied Nov. 12, 1975.

John B. McNamara, McNamara, Smith &
McNamara, Waco, for appellant.

Aubrey Davee, Brady, for appellee.

O'QUINN, Justice.

Pure Milk and Ice Cream Company
brought this suit on sworn account against
S. P. Tomlinson, doing business in Brady,
Texas, as Hill Country Creamery, to recover
an unpaid balance of $600 on the account
and for attorney's fees in the sum of $300.
Pure Milk filed suit in McLennan County,
its place of business, and the cause was
transferred to McCulloch County on Tom-
linson's plea of privilege.

Tomlinson answered and brought a counterclaim for $700 claimed under an oral lease for hunting rights for the 1972 season on 900 acres of land Tomlinson held in McCulloch County.

The cause was tried before the county court without a jury. The trial court found that Pure Milk proved its account as just, correct, and due. The court also found that Tomlinson "having offered his evidence as to his counter claim or setoff," and Pure Milk "had not controverted or denied the existence of this cutoff [sic], the Court is therefore of the opinion that the Plaintiff [Pure Milk] take nothing by reason of this suit." Costs were assessed against Pure Milk.

Since Pure Milk was not required to controvert or deny the counterclaim and Tomlinson failed to discharge his burden to prove an existing lease with Pure Milk for the 1972 hunting season, we will reverse the judgment of the trial court and render judgment for Pure Milk.

In January of 1971 it appears that Tomlinson was indebted to Pure Milk for ice cream Pure Milk sold to him "at the price and of the value of $2,002.81." By the early part of September of that year Tomlinson had reduced the account balance to $1,400, and the parties entered into an agreement, later confirmed in writing, by which the account would be further reduced by $700. The agreement on the part of Pure Milk was made by Fred Storm on a visit to Brady, and Storm later confirmed the agreement on behalf of Pure Milk in a letter from Waco to Tomlinson dated September 27, 1971, quoted in pertinent part:

". . . I am sending this letter to verify and confirm that we are accepting your place as a hunting lease for one year beginning September 1, 1971 and ending September 1, 1972. We understand that this includes all hunting rights.

"As we have discussed, we will credit your account in the amount of $700 which is the total fee for the one year's lease. This $700 will be applied toward your present balance of $1,400. If this is not satisfactory, give me a call."

In his counterclaim Tomlinson pleaded that it arose because Pure Milk "or its agents leased [the] same [900 acres] again for the year 1972" at the same rental price of $700. If proved, the counterclaim would balance the account Tomlinson had with Pure Milk for earlier purchases of ice cream.

The circumstances of the alleged renewal of the hunting lease for the 1972 season was related by Tomlinson, in part by responses to request for admissions and again in testimony given by him at the trial. Tomlinson stated that late in December of 1971, on the final hunt of the season after Christmas, one of the hunters, whose name he did not know, said, ". . . we want to take this place next year, also." Tomlinson said the renewal was to be for the same rental of $700. Tomlinson described the hunter as "this boy was a young fellow . . . I think he worked in Austin, out of the Austin area." Tomlinson testified, "There were three or four of them—maybe five" on the hunt who were present when the "young fellow" spoke about keeping the place for 1972. Tomlinson did not know the names of the other persons present.

Tomlinson testified that the "young fellow" was the one who asked for the key and brought some of the hunting groups during 1971 to the lease. Tomlinson also testified that either the "young fellow" or another person, one Tomlinson did not recall hunting deer the year before, "came out during the dove season" in 1972 with some fellows ". . . he came out hunting, after the dove season opened. And he was plant— He was the Plant Superintendent—Not superintendent, but he was—You know, he is no longer there, I don't think. But, he was the man that did the operations inside the plant there." It is not clear whether the dove hunter was the man "out of the Austin area" or another who handled "operations inside the plant there" in Waco.

There is no evidence in the record, and Tomlinson did not testify, that any person purporting to be from Pure Milk hunted on the Tomlinson tract during the 1972 deer and turkey season which extended from the middle of November, 1972, through the first weekend in January, 1973.

Tomlinson testified that "shortly after the first of the year," apparently early in January of 1973, Fred Storm, the Pure Milk representative with whom the 1971 agreement was made, called Tomlinson "one day and asked me about this account." Tomlinson stated he suggested to Storm that ". . . we do like we do here in West Texas; we will just split it."

Tomlinson testified that Storm replied, "Well, now, Tomlinson, they are going to file on you. * * * I will talk to the people." "Now, who he meant," Tomlinson testified, "I don't know. I imagine the manager, Mr. Jensen, or some of the partners, or, whoever handles that part for him."

In reply to Storm, it was Tomlinson's testimony that he said, "Well I will tell you what I will do; I will go ahead and send you a hundred dollars to show you my faith, that I've got good faith in it." Tomlinson added, "And I offered to split with him. So, I sent him the hundred dollars. And the next thing I heard, well, they had served a citation on me."

The trial court appears to have based its judgment, that Pure Milk take nothing, on a theory of default growing out of Pure Milk's failure to controvert or deny "the existence of this cutoff," or Tomlinson's counterclaim for the hunting lease rents for 1972. Appellee on appeal places emphasis on the failure of Pure Milk to plead or offer evidence in reply to the counterclaim.

Appellee argues, "Nowhere, either by pleading or evidence, does Appellant deny that 'The young fellow['] from Austin (apparently the manager of the austin [sic] branch of Appellant), and who conducted the hunting parties, brought them dove hunting and got the keys lacked authority to enter into the hunting agreement with Appellee. Indeed no where does Appellant deny that he lacked any authority to enter into such hunting agreement. He was holding himself out as having such authority, and this is verified by his getting the key, bringing out hunting parties and apparently being in charge thereof, to all of which Appellant made no objections."

It is settled that Pure Milk, as plaintiff below, was not required, under the facts of this case, to reply to Tomlinson's counterclaim. McDonald states the rule in this language: "If the plaintiff, contesting the counterclaim, does not intend to urge any defensive theory which must be verified or any affirmative defense under Rule 94, he is not required to answer the defendant's counterclaim. Rule 81 states that he *may* plead to the counterclaim, which clearly is permissive." (Emphasis by author) 2 McDonald: Texas Civil Practice, sec. 8.02, p. 319 (1970 revision).

■ Having asserted the counterclaim, it was appellee's burden to prove a hunting lease for the 1972 season with Pure Milk, under the terms of which Pure Milk would apply the lease rents to Tomlinson's remaining balance of $700 on the ice cream account. The evidence offered was that a "young fellow" who hunted in 1971, called for the keys, and apparently "brought the fellows" to hunt, but whose name was not known and whose connection with Pure Milk was indefinite, or unknown to Tomlinson, said "we want to take this place next year" at the same price. Appellee argues that the "young fellow" held "himself out as having such authority."

We find no evidence in the record that "this boy [who] was a young fellow . . out of the Austin area" had actual authority to negotiate a second lease on the hunting acreage, or to agree on the amount of the rent, or to assure Tomlinson that the rents would be credited to Tomlinson's ice cream account. Tomlinson, by his own admission, knew only that the "young fellow" worked out of the Austin area, not in Waco

at the home office, and at the time of trial was no longer employed by Pure Milk. Since appellee offered no proof of actual authority, reliance must be on evidence, if any there was, that the "young fellow" acted under apparent or ostensible authority.

Pure Milk, the record shows, is a partnership composed of thirteen partners who reside in Houston, San Antonio, Dallas, Austin, Waco, and other cities of Texas. Tomlinson's negotiations for the 1971 hunting lease were with Fred Storm, who went to Brady to talk to Tomlinson, and who later in a letter from the home office in Waco confirmed the oral lease and its terms and that the $700 in rents would be applied to the ice cream account. It was Storm who called Tomlinson from Waco early in January of 1973 to ask about the unpaid balance of $700 on the account. Tomlinson at that time sent $100 to Storm who credited it on the ice cream account. Later, when Pure Milk sued on the account, suit was brought for remaining balance of $600, plus attorney's fees.

The settled law in cases of apparent authority of an agent is so clearly stated in Texas Jurisprudence that we set out the statement we find controlling in this case:

"In determining the extent of an agent's apparent authority, the paramount question involved is not the extent of the authority actually given, but, instead, the extent of authority that a third person, dealing with such agent, may justifiably believe the agent to possess. In measuring the extent of such authority, it is *not proper to consider either actions of the agent that are unknown to, and not ratified by, the principal, or powers that the agent pretends to possess.* On the contrary, *such authority must be determined solely by the principal's acts and not those of the agent.*" (Emphasis supplied) 2 Tex.Jur.2d, Agency, sec. 44, p. 485 (1959).

Tomlinson testified that he relied on the "young fellow" who asked for the keys and brought hunters to the lease in 1971 and believed he had a hunting lease with Pure Milk for the 1972 season. Tomlinson declined to lease to others who asked about hunting in 1972. Except for some dove hunters in September, there was no use made of the Tomlinson place for hunting in 1972. It is uncertain from Tomlinson's testimony whether the "young fellow . . out of the Austin area," who even under appellee's testimony was at most only an employee, was the one who went back in September to shoot doves, or another man who "did the operations inside the plant there" in Waco. In either case, Tomlinson did not connect Storm or any other official or partner with the trade for a second lease and did not identify any official or partner with whom he had business dealings as a member of the hunting party in September. Nor did Tomlinson claim that any person who hunted in 1971 under the Pure Milk lease returned to hunt deer in the 1972 season.

Pure Milk filed special exceptions directing the court's attention to the failure of Tomlinson in his pleadings to identify the person purporting to act for Pure Milk in obtaining hunting rights for a second year and to allege by what authority the purported agent acted. The trial court overruled all special exceptions and later in the trial overruled objections by Pure Milk to the introduction of testimony pertaining to the purported renewal of the lease for 1972.

Tomlinson failed to show that the actions of the purported agent were known to Pure Milk, or that Pure Milk afterwards approved or ratified such powers as the agent pretended to possess. The authority of the agent may be determined only by the acts of Pure Milk and cannot be shown solely by the acts of the purported agent. Tomlinson made the lease contract for 1971 with Fred Storm, yet made no effort to confirm the 1972 purported extension by inquiry of Storm, or Floyd Jensen, Jr., Pure Milk's manager in Waco, or any other person known to Tomlinson to be in authority at Pure Milk's home office. Tomlinson relied

entirely on an oral arrangement in the deer camp with "this boy . . . a young fellow," believed by Tomlinson to work out of the Austin area, at a time when the lease made with Storm had eight months more to run. It was Tomlinson's burden, under the circumstances, to exercise reasonable diligence and common sense to ascertain whether the boy who called for the keys had authority to bind Pure Milk to additional hunting season at a price of $700.

The trial court found that Pure Milk proved its claim for $600 on open account; that Pure Milk was indebted to Tomlinson for a hunting lease in 1972 in the sum of $700; and that Tomlinson requested no relief and filed no counterclaim for "the $100 extra owed him" by Pure Milk. The court filed the conclusion "That only a take nothing judgment could be rendered in this cause for the reason that it is undisputed that the Defendant [Tomlinson] owed the Plaintiff [Pure Milk] $600.00, and it is undisputed that the Plaintiff owed Defendant $700.00 as a counter claim or setoff for hunting lease, and since neither set of facts are [sic] denied, the Court as a matter of law must consider what is not denied as admitted." The judgment entered by the trial court comports to the findings of fact and conclusions of law.

The record shows that Pure Milk proved its claim for $600 on the open account, as found by the trial court. Pure Milk also made proof by competent evidence that Pure Milk was entitled to recover $300 as reasonable attorney's fees. Pure Milk was not required to answer or deny Tomlinson's counterclaim for $700 on the hunting lease for 1972, and failure to deny may not be taken as an admission that the debt was owing. Tomlinson failed to discharge his burden to show that the purported agent Tomlinson dealt with on the hunting lease for 1972 was an authorized agent of Pure Milk whose acts were binding on Pure Milk.

The judgment of the trial court is reversed. Judgment is rendered that Pure Milk and Ice Cream Company recover $600 on its open account together with $300 as reasonable attorney's fees; further, that S. P. Tomlinson take nothing by his counterclaim; and all costs, in the trial court and on appeal, are assessed against S. P. Tomlinson.

Reversed and rendered.